Your Honor, good morning. Michael von Lohenfeldt for the appellant, Dr. Pham. If it pleases the court, I'd like to save three or four minutes for rebuttal. So, Your Honors, as you know, we're here on appeal from a summary judgment decision. And as with any summary judgment decision, the question for this court is clear. Could a jury find that UCSF cut Dr. Pham's pay and benefits in retaliation for the protective complaint that he made about safety concerns about another doctor? The answer is yes. The record here contains numerous disputed material facts that would support a jury finding of retaliation. And we spent a considerable amount of time in our briefs laying those out. I just want to summarize some of the major points for you. And then obviously I'm happy to answer any questions the court has about the evidence. There are some issues in the briefs about the summary judgment standard. I assume the court understands completely well how summary judgment works. So although I'm happy to answer questions, I don't intend to address that otherwise. So there are four major points of the evidence. I'm sorry, your screen just shifted where your faces are. So now I'm looking at the wrong place. There are four major points now of evidence that would support a jury finding of retaliation. And those are the long-term prior acceptance of his work as not only sufficient, but exceptional. Two, the anger that Dr. Bass showed when the report was made and the false accusation that the report, you know, was drummed up. Three, the timing, which is very close here. And four, the sort of linchpin argument that the defense makes that Dr. Bass didn't know about Dr. Pham's appointment until this happened, which is just clearly false given the evidence. So those are the four, I think, most important points. As to the acceptance... Counsel, I have a couple of questions. It seems that the main point of controversy about salary or payment was whether your client should be required to work two and a half days per week in order to receive a full week's salary. In general terms, is that correct? Two and a half days in the clinic, Your Honor. My client was working two and a half days a week. I understand. I understand all of that. That's correct, Your Honor. And my understanding is that the position that UCSF took was that to get half payment during the work week, your client had a separate private practice, right? Correct. And the UCSF's position was in order to get 50 percent, you had to work 50 percent. Your client's response was, I did other things that entitled me to move up to the 50 percent qualification. Am I correct so far? That's generally correct. Yes, Your Honor. And although I would note that that's UCSF's position after the complaint, Dr. Pham did all the same work on the same schedule. There's no evidence anything changed. And UCSF's position before his complaint was that he consistently exceeded his expectations for performance. That's at ER 271, the review that he received in October 2011, a couple of years prior. There's no evidence that anything changed. So what changed is UCSF's position. And the question is, why did UCSF's position change? Dr. Pham's work didn't change. OK, I understand all of that. I'm trying to get to a point. If I'm wrong about it, you tell me, or if the facts suggest otherwise, you tell me. OK? Yes, Your Honor. So the position the hospital took was that you either have to work two and a half days per week to get 50 percent of payment for that week, or you have to show the other things that you're doing that entitle you to get 50 percent for working less than 50 percent. Am I correct so far? That's the position they took after he made his complaint. Yes. OK. And they asked him to provide evidence of this other work that entitled him to work two days but get 50 percent work. Is that right? They did say that, yes. And did he respond with that information? He did. He discusses this at ER 145 and 146 and 159, which are parts of his declaration that he discussed extensively with Dr. Spass what his work was. And UCSF's response for the first time was, but that work doesn't count. You need to do that work for free, which is not a position they had ever taken before. So did Dr. Pham provide a written report to them? No, he didn't do that because he wasn't going to participate in his retaliation. But that he was doing the work and they knew he was doing the work as he had been doing for a decade. And the evidence is clear that he had been doing the same work for a decade and that UC had considered it to consistently exceed the expectations for his performance until he made this complaint. So I agree, Your Honor, that Dr. Bass attempted to impose a new condition and that Dr. Pham did not cooperate with that new condition. But the question in a retaliation case is whether the motivation for the new condition was retaliation. Obviously, if there's no retaliation, UC can change the requirements for its employees. No one argues otherwise. But if the reason the requirements change is retaliation, that's illegal. And that's what we have here. They were perfectly satisfied with his work, more than satisfied, until he made the complaint. And there's no evidence anything changed. I would also... One other question, counsel. Is it correct that Dr. Bass recommended a pay increase for your client after the complaint was filed? No, Your Honor, that is not correct. Dr. Bass recommended that pay increase. The discussion was held in January and February. And if you look at 2 ER 148 and 277 and 3 ER 493 and 94, that shows the evidence of this communication with Dr. Bass in February, months before the complaint where the raise was approved. Now, the raise did not make its way through UC's, you know, bureaucracy prior to the complaint. And so when the complaint was made, Dr. Bass confirmed that he was giving the raise he had said he would give in February. But the decision had already been made. It had already been agreed to, at least by February. And the conversation in May was along the lines of, hey, you said you'd give me a raise. Why don't I have it yet? Right. So to characterize that as Dr. Bass agreeing to a raise after the complaint, I think really mischaracterizes the evidence. And a jury could clearly find that that that was already baked. That cake was baked in February, just had not been delivered yet. Now, you're distinguishing between when Dr. Bass agreed to a pay increase and when he actually recommended the increase, correct? No, no, no. The recommendation was also in February that at 493 and 494, which is Dr. Bass deposition, there's a discussion of Dr. Bass communications and emails with other people in the department. So the pay increase had not been processed completely by May. But that's not the same thing as him making that decision in May. But even if it was, he then immediately turned around and tried to find a way to cut the pay. The suggestion that Dr. Bass did not know my client was 50 percent FTE during the first two years he was chair is not consistent with the evidence. And there are regular reports that showed my client was receiving benefits, which Dr. Bass, the jury could find Dr. Bass was aware of. The other side makes no attempt in its brief to discuss or explain that evidence at all. There's evidence in the record that Dr. Bass was well aware of Dr. Pham's schedule. The other side makes no attempt to explain that evidence at all. All of Dr. Bass budgetary concerns existed by his own testimony from the day he became chair in 2014. And yet he made no attempt to do anything about Dr. Pham's wages or benefits for two years later, until after the complaint had been made. Why is that? I don't think the court properly found that as a matter of law, it had nothing to do with his complaint. A jury could easily conclude that Dr. Bass and UCSF generally were just fine with Dr. Pham, that they believed what they said in October 2011 about his performance until he made a complaint and stopped being a team player, just like the other people. I see Judge Thomas looks like he wants to ask a question. My question is this. I mean, you keep relying on the performance evaluation, but that's actually quite different from saying, hey, you aren't working the hours. You can have a very good performance and somebody said, well, no, you aren't working the proper hours. Well, Your Honor, I would suggest that you read the performance evaluation because it says it describes what he's doing and it says he consistently exceeds expectations for his performance. But a jury doesn't comment at all about this discrepancy between full time or a 50 percent and two and a half days. I you know, Your Honor, I think that maybe a jury could reach that conclusion. But as a matter of law, I think a jury could infer that it does because that was his job and he was doing his job. And it's not just the performance evaluation. Dr. Pham's own testimony is very clear on how much he was doing and that it was the same the whole time. And his testimony counts. You know, we can't just ignore what the plaintiff says about what he himself was doing or how he was treated for it. At no point did anyone from UC ever suggest Dr. Pham wasn't working enough or needed to do more until he made a complaint. OK, can I ask you, this is this is more a legal question than a question about the record. So let's just just assume for a moment, you know, hypothetically that the record showed that you have an employee who, in fact, is not working the hours he's supposed to. And there's a contractual commitment to have a certain number of hours. And he's not doing that. And they discover it because they're looking into him because he complained. And then having discovered it, they say, well, you're not doing what the contract says. And then they take action against him. Is that prohibited because it was set in motion because of the complaint? Or is it OK because they're allowed to enforce the contract? Right. So, Your Honor, I don't I want to fight your hypothetical, Judge Miller. So I'm going to try to answer accepting your hypothetical. But I'll note that you that you're assuming two facts. You're assuming one, the amount of work, but you're also assuming that they just discovered it right. And they just discovered it is important to your hypothetical. It's not the case here. In the situation you're describing, I believe the employer would raise essentially the Mount Healthy same decision anyway defense to retaliation and argue that even though and that wasn't brief below, but that even though the motive was motivated partially by retaliation, they made a decision that they were going to make anyway. I think a more accurate hypothetical, if we were going to assume that the work wasn't being done, which, again, I don't think the record supports. But if we assume that to take that as a hypothetical fact, the more accurate hypothetical is what if you have an employee who is doing less than they're contractually supposed to do and you know about it and you're fine with it and you just let it slide until they complain. But once they complain, you're not going to do them any favors anymore. Once they complain and they're not a team player, then you're going to hold them to the letter of their contract, even though you chose not to before. That would be a legal retaliation because we're right. It turns on why are you making the decision and whether you would have made the same decision anyway. And here, the evidence is that for a decade, they didn't make this decision, even though all the facts were there. And now that's what we think a jury could find on this record. And so I think, yes, if an employer learns through a retaliatory investigation some other fact they weren't aware of, which gives cause to take an employment action, the law allows as their burden for them to prove a same action anyway defense. But that wasn't raised here. And I don't think it's here. Counselor, what's your best case to the point that an employer is not entitled to enforce contract? I don't believe either side has cited a case involving that specific hypothetical, Your Honor. I'm not aware of a case that I think my best case, my best case is probably this court's decision in Black versus Grant County, which was from last July, where the employee had filed a lawsuit that was protected. And then they investigated and fired him for time card fraud. And the court notes, which clearly violates the contract, the court notes that the allegations of time card fraud long predated the protected conduct, and they didn't do anything about it. And it was only after the protected conduct that they dug up these old allegations and used them against him. So I think that's probably the closest example I can think of is the Black case. You only have 35 seconds left. Do you want to reserve? Yes, Your Honor. Give you a little time. All right. We'll hear from UCSF. Yes, good morning. I'd like to start and address in particular the issues that the panel just raised and the questions that were posed to counsel as those seem to be the focus of the inquiry. So with regard, first of all, and forgive me if I jump around a little bit, I was taking notes and they're not in any particular order. So first, with regard to the question about the condition that if Dr. Pham was, in fact, performing additional work of four hours per week, Dr. Bass gave him multiple opportunities. There were at least two letters and conversations where Dr. Bass requested that a monthly written report be provided. That occurred after approximately six months of Dr. Bass asking Dr. Pham what it is that he wanted to do. We're happy to give you a 50 percent appointment if you perform the work. But if you're not performing the work, then your appointment has to accurately reflect the number of hours that you're working. In, excuse me, at the excerpts of record, in particular pages 530 and then 540 to 542, Dr. Bass said a report should be submitted monthly documenting the activities that make up the additional 10 percent effort. That's not an oral report. That is a report documenting, providing documentation, substantiation of the additional 10 percent effort that was being performed. And had Dr. Pham provided that, it would have been a non-issue. But we know he didn't provide that because we heard counsel say that he didn't. Why? Because he ostensibly didn't want to participate in retaliation by complying with the request. I would ask, if in fact Dr. Pham was performing an additional four hours per week of work, why not provide the written report? Why was that such a big deal if the work was being done? But we know from both the declaration and the undisputed testimony of Dr. Bass, which is contained both in his testimony and also the February 2017 letter that was submitted, that he documented a conversation he had with Dr. Pham where he said, I specifically asked you, Dr. Pham, if it's your position that you should be paid for 50 percent of a full-time position, although you are only working 40 percent of the time. And both in the letter to which Dr. Bass' declaration, the testimony is undisputed that Dr. Pham responded, yes, I believe. But counsel, I think that is disputed, right? Because when I'm looking at Pham's declaration at 145 and he says, I met with Dr. Bass and explained that I was working 50 percent FTE as I had done since the beginning of my hire. And then he goes on to say that he sent him an email about it. So why couldn't a jury, if a jury believes that, then it seems like he did satisfy the requirement he was supposed to satisfy. Well, first of all, the requirement was documentation monthly of the work that was being performed. And there has been no evidence of a monthly documentation of the work that's performed. And with regard to what Dr. Pham then says that he was doing, follow-up calls to patients, checking in to see if things were completed, the testimony is undisputed that those types of tasks were not the types of tasks that were contemplated. Even going back to the original job description and appointment letter, those administrative tasks are not what was contemplated with regard to the 10 percent of work. The testimony is undisputed. How can you say that? I don't understand how you can say that's undisputed because that does seem to be the position of Dr. Pham and his declaration. Maybe he's wrong and maybe you don't have to believe him, but he's disputing it, isn't he? Well, I'm not sure how he is disputing it because the initial appointment letter where this was discussed with Dr. Pobrel identified what was required for the 50 percent. And with regard to, let's just say the other 10 percent of non-clinical work, it was very specific about what would be accepted. There's nothing in there about administrative tasks. Recall that it was him being a director of the clinic, which was the 5 percent, and then performing cosmetic surgery, which was the other 5 percent. So it's very clear what was going to be acceptable to satisfy that additional 10 percent requirement. There is also, in that job description and appointment letter, the additional 10 percent was going to be determined at the discretion of the chair. In other words, the chair was going to make the decision about what is permitted for that additional 10 percent of non-clinical work. Therefore, the discretion of what would be acceptable at this point, at the relevant time period, rested with Dr. Bast. And Dr. Bast has said administrative tasks, that's all part of being a doctor. You don't stop, your work doesn't stop or becomes an additional point of compensation after you leave the surgery room. Following up with the patient or doing all these things, those are incidental tasks that every physician performs. And none of our other physicians are paid additional compensation for those types of incidental tasks. That's a perfectly reasonable position, it seems to me. But in this context, I'm not sure how it helps you, because Dr. Pham's testimony, I mean, that is a reasonable exercise of Bast's discretion in the abstract. But Dr. Pham's testimony is, I'd been doing basically the same thing, and they were perfectly happy to let it slide for all the time I had been there until I complained, and then they weren't. I mean, that's what he's saying. So how does the fact that Bast has discretion as to whether to allow it, it seems to me that that doesn't really rebut the allegation that he did so for retaliatory reasons. Well, I think it does, in that appointments are on an annual basis. So therefore, the terms of employment are created annually. And the difference is also that this had been permitted under a prior chair, under Dr. Pogrel. So what is the trigger? The trigger is not the complaint that caused these changes. The triggering event was what has been corroborated and undisputed is that Dr. Bast was a new chair. He was new to the position. Once he got up to speed, he reviewed the records as part of Dr. Pham's request for additional compensation, and it also coincided with the August and September time frame when the chair works on renewal letters. And he stated that in the process of looking into the compensation and reviewing the terms of his appointment, he found for the first time the 2003 letter from Dr. Pham, which he classified as working 50%. That is what then prompted Dr. Bast to say, look, I'm the chair. I'm now responsible for the financial condition of this department. We're running in the red. No one else is working 2 days per week and being compensated with benefits and a higher And therefore, this is going to be the term of your next year's appointment. So even if Dr. Pokrell may have accepted it, Dr. Bast is the new chair who is responsible for determining appointments on an annual basis, had the right to ensure that the appointment and the compensation aligned with the actual work that Dr. Pham was doing, consistent with how others in the department were being paid. Of course, counsel, as your opponent argues, that's one way to look at it. The other way to look at it is that these requirements were never imposed upon him until he complained. That is true. Perhaps that would be relevant if we were talking about the same decision maker. The decision maker in this case was not Dr. Pokrell. He was gone. We are now talking about Dr. Bast, who came in and is the new chair. He has testified and there's no dispute. Counsel can say, well, it's hard to believe that he was there as the new chair and didn't look in reports or look at line items and see that Dr. Pham was getting benefits, although he was only working two days. But that is a credibility argument. It's an inference that's requested without actually being based on any evidence or facts. Dr. Bast has... You know, counsel, when I hear credibility and inference, my mind says jury trial. I understand. So let me put it in evidentiary standards. There has been no evidence that Dr. Bast saw reports, reviewed line items, saw any information prior to this reappointment timeframe that led him to believe or that should have led him to believe that Dr. Bast saw and therefore caused him to know prior to the fact. If I may, I'd like to go on to the issue of raise. There were questions about, didn't Dr. Pham receive a raise after he complained? It is true that the raise was discussed and was approved by Dr. Bast before the complaint, but the evidence is also the following. During the very same meeting where Dr. Pham and Dr. Patel complained about Dr. Perkins, and by the way, the complaint wasn't even about Dr. Bast. It was about Dr. Perkins. When they complained about Dr. Perkins during that same meeting, Dr. Bast then confirmed with both Dr. Patel, the other complainant and Dr. Pham, by the way, you're going to be receiving your salary increases soon. Dr. Pham admitted that. It's at page 539 of the excerpts of record where he says, you being Dr. told me and Chirag, that's Dr. Patel on Wednesday, May 18th, that we would receive a letter regarding our salaries soon. So in the same meeting where they're engaging in this protected speech, what does Dr. Bast do? Rather than being angry, he says, thank you for the information. He says he was very grateful. He walked outside with Dr. Pham, shook his hand, and during this meeting said to both of them, thanks for your complaint. By the way, you should be getting your salary increases soon. And even though that increase had been previously approved, Dr. Pham, I mean, excuse me, Dr. Bast, if in fact he had some retaliatory bias, could have elected not to proceed with that salary increase. Recall that he did that exact same thing with Dr. Perkins. Dr. Bast had granted an increase to Dr. Perkins. Once he learned of the complaint on May 18th from Dr. Pham and Dr. Patel, what did Dr. Bast do? He stopped Dr. Perkins' salary increase that he had approved for her. He shut down her clinic. He did an audit of her patient records. And he also talked to legal counsel, to the vice chancellor, to the dean, launched an investigation. So that undisputed evidence is indicative of two things. First of all, Dr. Bast could have, after receiving the complaint, could have said, you know what, Dr. Pham, actually I'm seeing now that we're running at a deficit and we really can't, you know, I know I indicated we'd give you an increase, but we really can't because we're in the red. He had the authority to do that and he didn't do it. He went forward with the salary increase and denied the salary increase to Dr. Perkins. But also his immediate response to the complaints of thanking everyone, shaking their hands, and taking immediate action, closing the clinic, doing an audit, investigating, talking to the dean, that is the conduct of someone who cares about a concern. It's the conduct of someone who wants to address the concern. It's not behavior of an individual who is upset that a concern has occurred. I also heard, although this wasn't developed much in counsel's argument, that one of the four items of evidence was Dr. Bast's anger. I'm not sure what's being referred to as anger because everything I just described that's corroborated is that Dr. Bast was very grateful for the concerns coming forward and took immediate action. If the reference is to the fact that Dr. Bast shook his finger, we cited shook his finger at the complainants. We cited the testimony of Dr. Bast where he said that was in the context of Dr. Pham saying, I'm bringing in the most revenue. And Dr. Bast said, you don't know what you're talking about, Dr. Pham. You are not generating the most revenue. In fact, these other physicians are generating the most revenue and we provided evidence to corroborate that that in fact was the case. It had nothing to do with the complaint against Dr. Perkins. And then, excuse me, finally, in the time I have left, I'd like to talk about the temporal proximity. You're actually over your time, but I'll give you a few seconds. I'm so sorry. I'm so sorry. So in our brief, we did cite the Wilson decision and the Villaremo decision. And we stated that in this case, the evidence of temporal proximity is insufficient because actually this change did not occur for eight months after multiple letters from Dr. Bast, after multiple requests to Dr. Pham to pick what he wanted to do, an effort to try to work things out. And Dr. Bast, please recall, initially, rather than reducing the appointment to 40% to correspond with the work, actually had added four more hours of work in the clinic to Dr. Pham. Dr. Pham absolutely refused to work an additional four hours, which again is suspect because if in fact he was already doing the work, he should have said, no problem. I'm already working an additional four hours. Here's what I'm doing. It was only after all of those opportunities to work this out and to try to find a way to ensure that the appointment is consistent with the work being done that Dr. Bast said, well, I have no option then. You're not giving me a report. I'm not seeing you doing anything else other than two hours of work. You're refusing to work two hours. Therefore, we can't propagate a fraud by saying that you're working 2.5 days when you're only working two days. That process took eight months. Thank you, counsel. We'll hear a rebuttal and we'll put two minutes on the board for you. You're muted. So I am. I apologize. Thank you, Your Honor. I mean, my friend makes a good jury argument. I'll give her that. But she asked you to believe her witness's testimony and not Dr. Pham's testimony. Dr. Pham testified very clearly in his declaration at 171 and at pages 156 to 157 of the record that Dr. Bast reacted angrily when he made the complaint, that he shook his finger about the complaint. Of course, Dr. Bast said something different. That's why we have trials. That's not a surprise to anyone. The assertion that Dr. Bast could have retaliated more and sooner is not a defense. Yes, it's true that he did not immediately deny the raise he'd already promised by their own admission at that first meeting. So what? As this court said in Kahl's alter, some people retaliate slow. Some people retaliate fast. Maybe it took a while for him to get worked up enough to do it as he stood on the complaint. We know that he accused Dr. Pham of filing a false complaint and set an investigation of him for doing it. So it was clearly it was bothering him. A jury could make those inferences. And in terms of whether he, and you heard it again, the lynchpin argument, he just learned, he just saw the 50%. Dr. Bast had been the chair for two years at this point, not as their brief says for a month, for two years. And I understand it was a mistake in their brief. That's what happens when you discuss things out of order. For two years, he'd been the chair. He approved Dr. Pham's appointment in the prior two August. He got regular reports as we show in the evidence, including an example of the report showing that Dr. Pham got benefits. He knew that his department was paying Dr. Pham's professional expenses for education, which he withdrew. This is not new information. And a jury could easily conclude that Dr. Bast is not telling the truth when he says, I didn't know. We don't need a confession to defeat summary judgment. And that's what they seem to think we need is Dr. Bast to admit that he knew something. So your honors, we think there's clearly enough evidence here for a jury to find that there was retaliation. There's nothing but evidentiary conflicts about what Dr. Pham's job was, whether he was doing the job, whether it was acceptable to UC before the complaint. And I think all of those factors would clearly justify a jury verdict. If we're here on appeal from a jury verdict on their appeal, you would affirm. And because of that, summary judgment on these claims should be reversed. Thank you, counsel. Thank you both for your arguments today. A case just argued will be submitted for decision. And we'll proceed to the next case on the oral argument calendar, which is prison legal news versus trial. Thank you.
judges: Hawkins, Thomas, Miller